UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:

Fair Andreen, Incorporated, Case No. 25-21724-gmh
Chapter 11

Debtor.

---

**OPINION**

---

The debtor asks the court to confirm its chapter 11 plan of reorganization. The Huntington National Bank (Huntington) objects to confirmation and voted to reject the plan. This opinion explains why the court denies confirmation.

I

A

Debtor Fair Andreen operates a commercial printing business under the name "City Press." Ex. 5, at 1. The debtor is owned by Steven Bates directly and indirectly through the ownership of the Fair Andreen, Incorporated Retirement Plan of which he is the sole trustee. *Id*. at 2. Steven Bates is the debtor's president "and hold[s] all officer positions." *Id*. at 1–2.

Fair Andreen purchased the City Press commercial printing business in early 2023 with funds from Bates's retirement-account and a U.S. Small Business Administration loan for almost $2 million from Huntington. *Id*. at 2; see also Claim No. 40-1. Huntington also provided the debtor with a $450 thousand revolving line of credit. Ex. 5, at 2. To secure the Huntington loans, the debtor granted Huntington a lien on all of its assets. *Id.* at 2.

After the sale closed, the business failed to meet the debtor's expectations. Its commercial printing business did not come close to generating earnings like those reported in the financial statements that the seller had provided Mr. Bates before the acquisition. *Id*. at 4. Mr. Bates testified that a post-acquisition analysis of those statements showed they were substantially overstated. *Id*. He also testified that because of the seller's alleged misrepresentations, he severely overpaid for the business. *Id.* "Th[e] reduced cash flow", he explained, "could not realistically service the debt that the Debtor incurred to finance the purchase of the Debtor's business." *Id*.

Soon after the debtor acquired the City Press business, moreover, two events further adversely affected the business. First, in "April 2024, a key sales employee, Gregory Retzlaff" quit. *Id.* at 5. Retzlaff had agreed not to compete with the debtor upon termination of his employment. But the debtor contends that Retzlaff went to work for a competitor, poaching the debtor's customers both before and after departing to facilitate the competitor's misappropriation of around $1 million of sales. *Id*.; ECF No. 291, Apr. 9, 2026 Evid. H'rg Test.

Second, in May 2023, the debtor signed a six-year equipment lease for a new Fuji press, requiring monthly lease payments of almost $19 thousand. *Id*. at 4. The debtor alleges that the Fuji press was defective, resulting in inventory waste and eleven months of uncompensated down time. *Id.* at 4–5; ECF No. 291, Apr. 9, 2026 Evid. H'rg Test.

Faced with operating shortfalls, the debtor borrowed almost $300 thousand from merchant cash advance companies in the third and fourth quarters of 2024. *Id.* at 5. By the end of 2024, the merchant cash advance companies were drawing more than $10 thousand a week from the debtor's bank account. *Id*.

B

The debtor filed this chapter 11 case on April 2, 2025. Huntington filed two proofs of claim totaling over $2.1 million, asserting that its claims were fully secured. Claim Nos. 39 & 40. Both claims are secured by the debtor's tangible property (cash,

accounts receivable, inventory, office furniture, vehicles, and equipment) as well as general intangibles, which includes the debtor's interest in causes of action related to the purchase of City Press, Retzlaff and his new employer, and Fuji (collectively, the Litigation Claims).

The debtor filed several versions of its chapter 11 plan before filing a modified chapter 11 plan and disclosure statement on January 30, 2026. ECF No. 250–51. The court approved the January 30 disclosure statement on February 2, 2026, and creditors voted on whether to accept the January 30 plan. ECF Nos. 253& 272. Class 2, which contains both of Huntington's claims and of which Huntington is the sole member, rejected the plan, and Huntington, which had exercised its election under §1111(b)(2) to have its claims treated as secured to the extent allowed, objected to confirmation. ECF Nos. 241, 272 & 274.

The court held an evidentiary confirmation hearing, and, at the conclusion of the evidence, the debtor requested leave to file a further amended chapter 11 plan. ECF Nos. 291 & 295, at 2. The court set a briefing schedule on plan confirmation based on the evidence presented at the confirmation hearing and the debtor's forthcoming amended chapter 11 plan. ECF No. 295.

The debtor filed its post-hearing amended chapter 11 plan on April 10, 2026. That plan embodies a substantial change to the plan's treatment of Huntington's secured claims. The January 30 plan provided that the reorganized debtor would make deferred cash payments to Huntington plus pay Huntington fifty percent of the net proceeds that the debtor received from the Litigation Claims after payment of litigation expenses and administrative expenses.[1] The April 10 plan proposes to assign and transfer all the

1. The January 30 chapter 11 plan provides that Huntington's claims are deemed allowed in the amounts stated in the proofs of claims, totaling $2,153,568.02. ECF No. 250, at 6. The plan further provides for the following treatment for Huntington's claim if Huntington voted to reject the Plan and elected to have its claims treated under §1111(b) (which it did):

debtor's rights in the Litigation Claims to Huntington "as a credit against [Huntington's] Allowed Claim for the value of the Litigation [Claims] as determined by the Court" and, in addition, to pay "Huntington Bank equal monthly installments of $5,700, or such other amount as determined by the Court, commencing on the 15th day of the month after the Effective Date for 125 months, or the number of months necessary to comply with §1111(b) of the Code as determined by the Court." ECF No. 297, at 5.

Huntington objected to the April 10 plan and argued against confirmation of that amended plan in its post-hearing brief. ECF Nos. 312-13. Huntington also filed a motion to "supplement" its opposition brief, asking the court to take note of the losses reflected in the debtor's March 2026 and April 2026 monthly operating reports. ECF No. 316, at 1. The debtor responded to Huntington's supplemental brief in its reply brief, and it filed a supplemental declaration of Steven Bates on June 12, 2026. ECF Nos. 317–18. The debtor also provided notice to creditors of the amended plan. No creditor changed its vote on accepting the plan.[2] ECF Nos. 306 & 309.

---

> The Debtor shall pay the full amount of the Allowed Claim, namely $2,153,568.02, reduced by any adequate protection payments received after the Petition Date and before the Effective Date, by paying Huntington Bank (A) 360 equal monthly installments, commencing on the 15th day of the first month after the Effective Date, and (B) the Net Litigation Proceeds under Section 6.7(e)(iii). No interest will be paid on the Claim. The number of monthly installments shall be reduced by the amount Huntington Bank receives, if any, from the Net Litigation Proceeds. The number of monthly payments shall not be reduced until Huntington Bank has actually received, and is in possession of any Litigation Proceeds. The monthly installments are estimated to be approximately $5,722. Not[ ]withstanding this Section 4.2(b)(ii) treatment, if Huntington Bank objects to confirmation of the Plan on the basis that the payments provided in this Sec[t]ion do not comply with § 1111(b) of the Code, then the Debtor shall make the payments as determined by the Court that meet the requirements of § 1111(b) of the Code.

*Id*. at 6. Section 6.7(d) of the January 30 plan defined "Net Litigation Proceeds" as the proceeds from the Litigation Claims after payment of any attorney's fees and litigation expenses, and section 6.7(e)(iii) of the plan provided that after payment of unpaid administrative expenses, fifty percent of Net Litigation Proceeds would be paid "to Huntington Bank toward its Allowed Secured Claim". *Id*. at 9.

All statutory references are to title 11 of the United States Code, unless otherwise indicated.

2. Huntington objects to the debtor's amended chapter 11 plan based in part on the unorthodox procedural posture of this case, arguing that in order to confirm the April 10 plan, the debtor was

II

A

The court may only confirm the debtor's plan of reorganization if the debtor proves by a preponderance of the evidence that its plan satisfies §1129. See §1129(a) ("The court shall confirm a plan only if all of the following requirements are met."); *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), aff'd, 85 F.3d 1415 (9th Cir. 1996) ("The debtor carries the burden of proving that a Chapter 11 plan complies with the statutory requirements for confirmation under §§ 1129(a) & (b)" and must do so by a "preponderance of the evidence".). The plan does not comply with §1129(a)(8)'s requirement that all classes accept the plan because Huntington (and thus Class 2) has rejected the plan. As a result, the court may only confirm the plan if the debtor proves its plan complies with §1129(b).[3] *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 291 (Bankr. N.D. Ill. 2008).

Section 1129(b)(1) provides that the court may only confirm a plan over a class's dissent if the plan's proponent shows that the plan's treatment of that class is "fair and equitable". To demonstrate that the plan is fair and equitable to a class of secured creditors, the plan proponent must show that the plan satisfies one of three alternative conditions: (i) the secured creditor retains its liens on the collateral and the plan provides for deferred cash payments the total of which at least equal the amount of the allowed claim and that have a present value that is at least equal to the value of the liens, (ii) the property securing the claim is sold free and clear of the liens, with the

---

required to obtain approval of an amended disclosure statement and then resolicit votes from creditors as required by §1125. ECF No. 313, at 13–15; see §§1125(b), 1127(c), & 1129(a)(1). The debtor didn't do that. Huntington argues that, as a result, the debtor cannot now request that the court confirm the April 10 plan. Huntington's argument is forceful, but the court need not resolve it because, as explained below, the plan cannot be confirmed even if it might be procedurally permissible to do so.

3. Huntington also argues that the plan does not comply with §1129(a)(11). ECF No. 313, at 8–13. The court will not address that argument because the plan's treatment of Huntington's claim does not comply with §1129(b)(2)(A).

creditor entitled to credit bid and the liens attaching to the sale proceeds, or (iii) some alternative course under which the secured creditor realizes the "indubitable equivalent" of its claim. §1129(b)(2)(A).[4]

The debtor's April 10 plan classifies Huntington's claims together in Class 2, as mentioned above. The plan's treatment of Class 2 is as follows:

> (i) ***Allowance***. The Claim of Huntington Bank, as stated in the proofs of claim filed by it as claim nos. 39 and 40, is deemed Allowed in the total of the amounts stated in the proofs of claim as of the Petition Date of $451,972.47 and $1,701,595.55, respectively. All other assertions in the proofs of claim such as the Claim being fully secured, entitled to attorney fees and interest after the Petition Date, to extent that they are inconsistent with the Plan are void and super[s]eded by the terms of the Plan. The Debtor will not object to the proofs of claim.
>
> (ii) ***Payment***. The Debtor shall pay the full amount of the Allowed Claim, namely $2,153,568.02, reduced by any adequate protection payments received after the Petition Date and before the Effective Date, by (A) assigning and transferring all the Debtor's rights to the Litigation [Claims] on the terms specified in the Plan, including Section 6.7, on the Effective

---

4. Section 1129(b)(2)(A) states:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

> Date as a credit against the Allowed Claim for the value of the Litigation [Claims] as determined by the Court and (B) paying Huntington Bank equal monthly installments of $5,700, or such other amount as determined by the Court, commencing on the 15th day of the first month after the Effective Date for 125 months, or the number of months necessary to comply with § 1111(b) of the Code as determined by the Court.
>
> (iii) ***Retention of Liens***. Huntington Bank shall retain its Liens that existed on the Petition Date to secure the Debtor's performance under the Plan.

ECF No. 297, at 5 (underline emphasis added, other emphasis in original). After the plan was filed, the debtor filed a supplemental brief in support of confirmation stating that the provision's statement of monthly payments for 125 months was an error and the debtor intended that the plan provide for "164 installments of $5,700 plus a final installment of $1,317." ECF No. 330, at 3.

B

The court must determine whether the plan's treatment of Class 2 complies with §1129(b)(2)(A)(i) or (iii), since §1129(b)(2)(A)(ii), which governs a plan's sale of collateral, plainly does not apply.

1

When a secured creditor elects under §1111(b)(2) to have its claim treated as secured in the allowed amount of the claim, as Huntington has here, §1129(b)(2)(A)(i)(II) requires that the plan provide the creditor with "deferred cash payments" that (1) have a present value at least equal to the amount of the lien (or the collateral value) as of the plan's effective date and (2) a total nominal value that at least equals the amount of the allowed claim. *In re Wis. & Milwaukee Hotel LLC*, 678 B.R. 183, 198 (Bankr. E.D. Wis. 2026).

The debtor contends that the plan requires it to make monthly payments to Huntington of $5,700 for "164 installments . . . plus a final installment of $1,317" (ECF No. 330, at 3) "or the number of months necessary to comply with §1111(b) of the Code

as determined by the Court." ECF No. 297, at 5. Starting with the second requirement in §1129(b)(2)(A)(i)(II), i.e., that plan provide for cash payments that have a nominal total value at least equaling the amount of the allowed claim, the debtor would have to propose a payment plan of more than 31 years to satisfy that amount, because the total claim amount of $2,153,568.02 divided by $5,700 (the monthly payment amount) equals about 378 months. While the plan could theoretically pay that, the debtor did not prove that such a plan would be feasible (that is, the debtor did not prove that a 30-plus-year reorganization plan for a commercial printing business that has operated at a loss during much of its time as a debtor in possession, was not worth what the debtor initially paid for it, and potentially faces years of uncertain litigation meets §1129(a)(11)'s requirement that "[c]onfirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization").

The plan also does not comply with §1129(b)(2)(A)(i)(II)'s second requirement, i.e., that the plan will provide deferred payments to Huntington that have a present value at least equal to the value of Huntington's liens as of the plan's effective date. The uncontested value of Huntington's liens exceeds $2.1 million. The number of months the plan will take to distribute payments that have a value on the plan's effective date of over $2.1 million is not easily determined from the terms of the plan because to determine the present value of those deferred payments, one must know the applicable discount (or cramdown) rate and the plan omits any mention of that rate, even though the debtor filed the April 10 plan after the close of all evidence at the confirmation hearing.

"Determining the present value of the plan's future payments requires discounting those payments by an appropriate rate." *Wis. & Milwaukee Hotel LLC*, 678 B.R. at 201 (citing *In re Hammond*, 667 B.R. 42, 46 (Bankr. E.D. Wis. 2025), and 4 William L. Norton III, *Norton Bankruptcy Law & Practice* §113:15 (3d ed., Oct. 2025 update)); see also *id.* ("In calculating present values, the deferred payments are discounted by the rate

of return or interest factor to reflect the opportunity cost of capital. It is the rate of interest which equates the deferred cash payment with the present value of the payment." (quoting 4 Norton, supra)). The plan's discount "rate must reflect 'the non-eliminable risk of default, inflation, and the opportunity costs associated with the inability of the creditor to use the money right away, whether for investment or any other profitable purpose.'" 678 B.R. at 201 (quoting Matthew Wiener, *Cramdown Interest Rates in the Commercial Credit Context: Arguments for the Two-Step Approach in Chapter 11*, 74 N.Y.U. Ann. Surv. Am. L. 223, 231 (2018), and comparing *In re Oil Spill by Amoco Cadiz Off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1332–35 (7th Cir. 1992)). Even if one uses a rate of 4.3 percent as the discount rate—the approximate ten-year Treasury note rate when the confirmation hearing took place and a discount rate that is less than the rate proposed by the debtor's expert and certainly far too low given the risk that the debtor's business will lead to a plan default—the plan cannot pay the present value of $2.1 million with monthly payments of $5,700 because the accruing interest exceeds the monthly payments.

The debtor seeks to avoid this obstacle by resorting to the plan's further "payment" provision—that the plan "assign[s] and transfer[s] all of the Debtor's rights to the Litigation [Claims] on the terms specified in the Plan, including Section 6.7, on the Effective Date as a credit against the Allowed Claim for the value of the Litigation [Claims] as determined by the Court". The debtor contends Huntington realizes more than $2.1 million under the plan based on Huntington's receipt of about $1.3 million of Litigation Claims and deferred payments having a present value equal to its non-Litigation-Claim collateral (equipment and other tangibles), which has a value of about $658 thousand (after subtracting around $100 thousand in adequate protection payments).

But the claimed credit for transferring collateral does not enable the plan to comply with §1129(b)(2)(A)(i)(II). That subparagraph requires "deferred *cash*

payments", and a transfer of rights in the Litigation Claims is obviously not a "cash payment". §1129(b)(2)(A)(i)(II) (emphasis added); compare §1225(a)(5)(B)(ii) (imposing as a condition on chapter 12 plan's treatment of secured claims that the plan provide, "the value, as of the effective date of the plan, of *property* to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim" (emphasis added.)); §1325(a)(5)(B)(ii) (same)). As a result, the plan's treatment of Class 2 does not satisfy §1129(b)(2)(A)(i)(II).

2

The plan also cannot be found to be fair and equitable by satisfying §1129(b)(2)(A)(iii)'s requirement that it "provide[ ] . . . for the realization by [Huntington] of the indubitable equivalent of [Huntington's secured] claims." In this "context, '[t]he phrase "indubitable equivalent" . . . means in essence, that the treatment afforded the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim, and also insure the integrity of the creditor's collateral position.'" *Bate Land Co. LP v. Bate Land & Timber LLC (In re Bate Land & Timber LLC)*, 877 F.3d 188, 192 (4th Cir. 2017) (quoting 4 *Collier on Bankruptcy* ¶506.03 (16th ed. 2017)). The prototypical indubitable equivalent of a secured claim is the surrender of the collateral. See 7 *Collier on Bankruptcy* ¶1129.04[2][c][i] (Richard Levin & Henry J. Sommer, eds., 16th ed. 2026) ("First, abandonment, or other unqualified transfer of the collateral, to the secured creditor satisfies this [indubitable equivalent] requirement." (first citing *Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.*), 881 F.2d 1346, 1350 (5th Cir. 1989); then citing *In re Pennave Props. Assocs.*, 165 B.R. 793 (E.D. Pa. 1994); then citing 124 Cong. Rec. 32,407 (1978) (remarks of Rep. Edwards); and then citing 124 Cong. Rec. 34,007 (1978) (remarks of Sen. DeConcini)).

The debtor's treatment of Huntington's claim—transferring a portion of the collateral to Huntington and retaining the rest subject to Huntington's liens with deferred payments as compensation—makes §1129(b)(2)(A)(iii) inapplicable. *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 648 & n.4 (2012) (Reading §1129(b)(2)(A)(iii)'s indubitable equivalence provision as a general fair-and-equitable condition that does not apply to plan treatment falling within the scope of §1129(b)(2)(A)(ii)'s specific sale provision). Perhaps recognizing this, the debtor contends that by transferring the Litigation Claims, it gives Huntington the indubitable equivalent of part of its secured claims (referencing §1129(b)(2)(A)(iii)) and then provides Huntington with deferred cash payments for the remainder of its secured claims (referencing §1129(b)(2)(A)(i)). ECF No. 317, at 6. As the debtor states, "The Plan as modified proposes to satisfy the secured claim by (1) transferring to the Bank a portion of its collateral that is a general intangible, litigation, and (2) retaining equipment and other collateral, subject to the Bank's liens, and providing the Bank with payments with a present value equal to the value of the collateral retained." ECF No. 311, at 6 (citing Plan, ECF No. 297, § 4.2(b)(ii)); see also *id.* at 10 (debtor proposes that the plan will pay the present value of the "remaining balance of the Bank's claim".).

This mix-and-match approach to §1129(b)(2)(A) is untenable, however. Again, §1129(b)(2)(A)(i)(II) requires that the secured creditor receive "deferred cash payments totaling at least" (1) "the allowed amount of such [secured] claim" and (2) the present value of its lien on the estate's interest in the collateral. Even if one accepted the debtor's contention that the value of the liens could be reduced by the return of a portion of the collateral (justified for §1129(b)(2) purposes by subparagraph (iii)), Huntington exercised its right under §1111(b)(2) to have its claims treated as secured "to the extent that such claim[s are] allowed." The allowed amount of the claims exceeds $2.1 million, and the total amount of the deferred payments proposed under the debtor's plan is less than $1 million.

The indubitable equivalence provision in §1129(b)(2)(A)(iii) cannot be used to circumvent the requirements of subparagraph (i). *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*'s construction of §1129(b)(2)(A) does not allow it. 566 U.S. at 647.

There the Court concluded that a plan providing for the sale of the secured creditor's collateral with no right to credit bid—an express component of §1129(b)(2)(A)(ii)'s fair-and-equitable condition for plans providing for collateral sales—could not resort to §1129(b)(2)(A)(iii)'s indubitable equivalent condition to be found fair and equitable. As the Court reasoned, §1129(b)(2)(A)'s structure "suggests . . . that [1129(b)(2)(A)](i) is the rule for plans under which the creditor's lien remains on the property, [1129(b)(2)(A)](ii) is the rule for plans under which the property is sold free and clear of the creditor's lien, and [1129(b)(2)(A)](iii) is a residual provision covering dispositions under all other plans—for example, one under which the creditor receives the property itself, the 'indubitable equivalent' of its secured claim." *RadLAX*, 566 U.S. at 647. Just as the Court held that "debtors may not sell their property free of liens under § 1129(b)(2)(A) without allowing lienholders to credit-bid, as required by clause (ii)", the debtor here may not retain some of Huntington's collateral and provide deferred payments totaling less than the amount of Huntington's $2.1 million secured claim. *Id*. The debtor's plan is one in which "the creditor's lien remains on the property" and provides for deferred cash payments under §1129(b)(2)(A)(i); as such, it must satisfy the requirements of §1129(b)(2)(A)(i). *Id.* Those requirements include that, if the creditor elects under §1111(b)(2) to have its claim treated as secured in the full amount of the allowed claim, the creditor retains its liens until it receives deferred cash payments that equal at least the full amount of its allowed claims (here, over $2.1 million), as well as paying at least the present value of the liens on the estate's interest in the collateral. The debtor's plan provides that the debtor will retain the tangible collateral, but it obviously does not provide deferred cash payment that at least equal the amount of Huntington's allowed claims, as required by subparagraph (i). *RadLAX* forecloses ruling that the debtor's plan proposes treatment that is fair and equitable to Class 2 under §1129(b)(2)(A)(iii).[5]

5. The debtor relies on *In River East Plaza, LLC*, 669 F.3d 826 (7th Cir. 2012), to support its contention that the plan can be confirmed under §1129(b)(2)(A)(iii). ECF No. 311, at 5–7; ECF No. 317, at 5.

III

For the reasons stated above, the court will enter an order denying confirmation of the debtor's plan.

October 23, 2026

G. Michael Halfenger
United States Bankruptcy Judge

---

The Seventh Circuit decided *River East Plaza* while *RadLAX* was pending in the Supreme Court. 669 F.3d at 828. *River East Plaza* observed that the logic of the court of appeals' decision in *RadLAX* prevented confirmation of a cramdown plan that avoided one of §1129(b)(2)(A)(i)'s requirements by resorting to §1129(b)(2)(A)(iii)'s indubitable equivalence provision: "While the debtor in [*RadLAX*] sought to avoid the creditor's right to credit bid under subsection (ii) by invoking indubitable equivalence, River East seeks to avoid the requirement in a subsection (i) cramdown of maintaining the mortgage lien on the debtor's property by transferring LNV's lien to different collateral, also in the name of indubitable equivalence. The logic of [the court of appeals' opinion in *RadLAX*] forbids such an end run . . . ." 669 F.3d at 829. That reasoning of *River East Plaza* thus further supports the conclusion that the Supreme Court's affirmance in *RadLAX* forbids the end run proposed here—that a partial return of collateral and the invocation of subparagraph (iii)'s indubitable equivalence condition can nullify subparagraph (i)'s requirement that deferred payments must total at least the amount of the allowed secured claim.

The debtor cites *Bate Land & Timber LLC*, 877 F.3d 188, and *In re National Truck Funding LLC*, 588 B.R. 175, 183–84 (Bankr. S.D. Miss. 2018), in support of its mix-and-match approach to §1129(b)(2)(A). ECF No. 311, at 7–9. *Bate Land & Timber* "decline[d] to hold that a partial dirt-for-debt plan can never provide the indubitable equivalent of a secured creditor's claim, as a matter of law." 877 F.3d at 197–98. And *National Truck Funding* suggests that a plan transferring part of the collateral to the secured creditor and retaining the rest can be found fair and equitable by applying both §1129(b)(2)(A)(i) & (iii). 588 B.R. at 183–84. Neither decision discusses *RadLAX*, however; nor do those decisions address whether a plan's treatment of a class of secured creditors may be found fair and equitable if that treatment includes deferred payments that do not satisfy the conditions imposed by §1129(b)(2)(A)(i), including that the total payments to each holder of a secured claim at least equal the allowed amount of that claim. As a result, neither decision persuasively supports the conclusion that the debtor's plan provides for Class 2 in a way that satisfies any of the fair-and-equitable conditions of §1129(b)(2)(A).